E-FILED; Montgomery Circuit Court
Docket: 4/7/2026 10:22 AM; Submission: 4/7/2026 10:22 AM
Envelope: 25905714

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**KIRSTEN RYAN.**
727 Owens Street
Rockville, MD 20850

**Plaintiff,**

v.

**CUSHMAN & WAKEFIELD U.S., INC.**
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
**SERVE ON RESIDENT AGENT:**
The Corporation Trust Incorporated
2405 York Road, Suite 201
Lutherville-Timonium, MD 21093

**Defendant.**

Case No. C-15-CV-26-002002

## COMPLAINT

Plaintiff Kirsten Ryan ("Plaintiff") by and through undersigned counsel, files the instant Complaint against Defendant Cushman & Wakefield U.S., Inc. ("Defendant" or "Company"), and states the following in support thereof:

### PARTIES, JURISDICTION, & VENUE

1.     Plaintiff is an adult residing in Rockville, Maryland.

2.     Defendant is a corporation organized under the laws of Missouri with its principal place of business in Chicago, Illinois.

3.     Defendant is a registered foreign corporation in the State of Maryland.

4.    Pursuant to MD CODE ANN., CTS. & JUD. PROC. § 6-103(b), this Court has personal jurisdiction over Defendant because Defendant transacts business and/or contracts to supply services in the State of Maryland.

5.    Pursuant to MD CODE ANN., CTS. & JUD. PROC. § 1-501, this Court has subject matter jurisdiction over this action, because the Circuit Court is a court of general jurisdiction with full common law and equity powers in the State of Maryland.

6.    Venue is proper in this judicial forum pursuant to MD CODE ANN., CTS. & JUD. PROC. § 6-201(a) because Defendant carries on a regular business in Montgomery County, Maryland.

## FACTS COMMON TO ALL COUNTS

7.    Plaintiff was a real estate broker for Defendant from January 1, 2018 until October 29, 2025. During this time, Plaintiff often provided services to clients for Defendant from her home in Rockville, Maryland.

8.    Before becoming a real estate broker for Defendant, Plaintiff worked for Defendant in various capacities in support of its real estate business beginning in 2013.

9.    Plaintiff and Defendant entered into a written broker/salesperson agreement purporting to set forth the terms of their relationship on or about January 1, 2018. This agreement is attached to the Complaint as Exhibit A.

10.    Plaintiff worked in Defendant's DC Metro Healthcare Advisory Practice ("Healthcare Advisory Practice").

11.    During her time working for Defendant, Plaintiff ascended from a role as a salaried support employee to a full-fledged real estate broker. As a broker, she originated and closed dozens of real estate transactions each year, including many transactions worth millions of dollars. By

2025, Plaintiff's title at Defendant was Senior Director, and she, as well as her colleague of equal standing, Lindsey Groom, were both on the cusp of being eligible for promotions to Managing Director based on their exemplary performances as brokers.

12.    Along with her colleagues, Plaintiff was instrumental in building and growing the Healthcare Advisory Practice.

13.    Plaintiff worked closely with her manager, Matthew Sullivan, in the Healthcare Advisory Practice. Sullivan's title was Executive Managing Director of the Healthcare Advisory Practice.

14.    As a real estate broker, Plaintiff was compensated based on commissions received by Defendant from real estate transactions that Plaintiff and/or her colleagues in the Healthcare Advisory Practice facilitated and closed. *See generally* Ex. A.

15.    It was the practice of brokers in the Healthcare Advisory Practice to split the gross commissions received by the Defendant from real estate deals closed by the Healthcare Advisory Practice. More specifically, each member of the Healthcare Advisory Practice received a pre-determined percentage of the commission received by Defendant from all the deals closed by the Practice. Therefore, brokers within the Healthcare Advisory Practice routinely received commissions from real estate deals in which they did not personally provide brokerage services.

16.    For example, Plaintiff received commissions ranging from 18-20% of the gross commission payable to Defendant upon the close of a transaction by the Healthcare Advisory Practice, whether or not she brought in the client or provided any brokerage services to the client.

17.    The practice of splitting commissions among members of the Healthcare Advisory Practice was established beginning in at least 2018, and commissions from more than 500 closed

real estate transactions were distributed to Plaintiff and other members of the Healthcare Advisory Practice on this basis.

18. In or about late September 2025, Matthew Sullivan advised Plaintiff that her role with the Healthcare Advisory Practice needed to change from that of a broker to a role that he termed as the "COO of Transactions." The Healthcare Advisory Practice, of course, never before had a "COO of Transactions." Rather, brokers were responsible for handling the administrative processing of transactions on which he or she worked with the assistance of other salaried employees of Defendant. Accordingly, this new role would be a salaried position with less financial upside and professional growth potential, and Plaintiff would no longer be involved in soliciting new business and would only focus on servicing the existing business.

19. Plaintiff had been a broker in the Healthcare Advisory Practice of Defendant for nearly eight (8) years and viewed Sullivan's ill-defined proposed change to her role as a demotion, not only in terms of lesser earning potential (commissions versus a fixed salary), but also in terms of lesser opportunities for professional growth and development. Plaintiff initially refused to accept this lessened role.

20. On or about October 2, 2025, Sullivan again presented Plaintiff with the change to her role in the Healthcare Advisory Practice, this time indicating that she could either accept the new undefined role as "COO of Transactions" or leave the Company.

21. Upon information and belief, Sullivan desired to terminate Plaintiff's tenure with the Company because Plaintiff was earning significant commissions, was due for a promotion, and because Plaintiff's colleague, Lindsey Groom, was on the same promotional track and commission structure. By eliminating Plaintiff's commission structure, Sullivan and other brokers in the Healthcare Advisory Practice would earn greater commissions.

22.    Despite her initial reluctance, on or about October 3, 2025, Plaintiff informed Sullivan that she would accept the role as "COO of Transactions" out of a desire to continue working with the Healthcare Advisory Practice, which she successfully helped build.

23.    However, after additional discussions with Sullivan, it became clear to Plaintiff that the new position, which was hastily promised without any structure or clearly defined duties and opportunity for advancement, was destined to fail. Sullivan further advised Plaintiff that he did not want to put Plaintiff in a position where she did not think she could succeed. Nevertheless, he promised to "pay [her] out" for her work in the Healthcare Advisory Practice.

24.    On or about October 6, 2025, Sullivan told Plaintiff "I'm done - and we can come up with whatever story that you want" about her departure from the Company. Sullivan and Plaintiff agreed that her last day at the Company would be October 31, 2025, and Sullivan again promised to "pay [Plaintiff] out."

25.    Upon information and belief, Sullivan never intended to engage Plaintiff as "COO of Transactions," as evidenced by the fact that he did not hire anyone in such a position following Plaintiff's departure from the Company. Sullivan's offer of such a position to Plaintiff was illusory.

26.    In the intervening days and weeks, Sullivan repeatedly gave Plaintiff assurances that she would be "paid out" for her work with the Healthcare Advisory Practice. Relying upon these assurances, Plaintiff continued working for Defendant and diligently helped transition her clients to other brokers in the Healthcare Advisory Practice.

27.    On or about October 21, 2025, Plaintiff emailed Sullivan asking for his assistance in drafting a "protected list" of real estate transactions that would produce commissions payable to her after she left the Company.

28.    Pursuant to paragraph 8 of Plaintiff's broker/salesperson agreement with Defendant, at or prior to the end of her engagement with the Company, Plaintiff was required to prepare, on a form provided by the Company, a "Pending Deals List," which set forth "all uncompleted transactions upon which [Plaintiff] had been working." *See* Ex. A ¶ 8(a). Plaintiff's email to Sullivan about the "protected list" was an effort to comply with this obligation, ensure a smooth transition of clients to other brokers, and confirm the deals she would be paid commission on after she left the Company.

29.    In an email response to Plaintiff on October 23, 2025, Sullivan described the content of the pending deals list for which Plaintiff would be paid commissions after her departure as follows: "anything we book before December 31st no change . . . [t]hen pick like 10 deals that could go to March 31 (thought is if some of the bigger deals like Lafayette or Huntsville leak, you should be paid on them)."

30.    Plaintiff understood Sullivan's email to mean she and her team would split, as was their custom, commissions on all deals that the Healthcare Advisory Practice closed prior to December 31, 2025 (as Sullivan had previously promised her), along with 10 deals of her choice that "leaked" between January 1, 2026 and March 31, 2026, including Lafayette and Huntsville, which were two of the Healthcare Advisory Practice's "bigger deals" with sizable commissions. Conversely, Plaintiff reasonably relied upon and understood that any commissions for deals on which she was the principal broker would also be split with other brokers, as was the Healthcare Advisory Practice's long-standing custom and course of dealing.

31.    In an email dated October 28, 2025, Plaintiff sent Sullivan a draft of her resignation letter and a pending deals list that conformed to the parameters he set forth in his October 23, 2025

email (described above). In this email, Plaintiff also advised Sullivan that she accepted a job offer for a broker position at another real estate brokerage firm.

32.    By email dated October 29, 2025, Sullivan responded to Plaintiff that it "is awesome!!" that she accepted a job at another real estate brokerage firm.

33.    Indeed, it is common for real estate brokers to move between different real estate brokerage firms during their careers. Plaintiff's broker/salesperson agreement with Defendant did not contain non-compete restrictive covenants.

34.    Later that day, Plaintiff emailed Sullivan and Kevin Brandt, the Director of Brokerage for Defendant, a draft of her resignation letter and the pending deals list that conformed to the parameters set forth by Sullivan in his October 23, 2025 email (described above) and his prior promises to Plaintiff.

35.    Upon information and belief, Kevin Brant previously worked at a competing real estate brokerage firm to Defendant.

36.    Hours after Plaintiff sent this email to Sullivan and Brandt, Defendant terminated Plaintiff's access to her files. As such, Plaintiff's engagement as a broker for Defendant effectively ended on October 29, 2025: two days before Plaintiff's previously planned resignation.

37.    Paragraph 5 of the broker/salesperson agreement requires the parties to give "fourteen (14) days prior written notice to the other of the election to terminate." Ex. A ¶ 5. Defendant did not provide Plaintiff with the proper written notice prior to her termination on October 29, 2025.

38.    In an email dated November 3, 2025, Sullivan sent Plaintiff a pending deals list that substantially differed from the list he initially proposed via email on October 23, 2025 (described above). This list contained far fewer deals resulting in significantly less compensation to Plaintiff.

Most notably, Defendant's proposed deal list removed many of the ten (10) deals of Plaintiff's choice that might "leak" to the end of the first quarter of 2026 and removed altogether Plaintiff's commission split on the substantial Lafeyette and Huntsville deals, which Sullivan previously admitted Plaintiff should be paid on. Plaintiff asked Sullivan to reconsider the deals list in light of his previous promises to her during the month of October.

39.    In an email dated November 19, 2025, Brant sent Plaintiff another pared-down deals list, which cut out the commissions payable to Plaintiff by over $400,000 from the commissions potentially payable to her pursuant to the list described by Sullivan's October 23, 2025 email (described above) and Sullivan's prior promises to her.

40.    If Plaintiff accepted the pared-down pending lists of deals proposed by Defendant (through Sullivan and Brant), Sullivan and other brokers in the Healthcare Advisory Practice would receive a larger amount of the commissions received by Defendant from the deals that were excluded from the list proposed to Plaintiff — such is the natural consequence of one less broker in the Healthcare Advisory Practice splitting commissions on those deals.

41.    Further, under Defendant's pared-back deals list, Plaintiff would be cut out of the commissions for many deals that she worked on during the months prior to her termination because many real estate deals close in the final quarter of the year, or "leak" into the first quarter of the following year.

42.    Paragraph 8(b) of Plaintiff's broker/salesperson agreement with Defendant states that "[Plaintiff] shall not be entitled to share in any commissions or fees collected by C&W subsequent to the termination of [Plaintiff's] engagement, except as otherwise agreed to by [Plaintiff] and C&W and set forth in a fully executed Pending Deals List . . . ." Ex. A ¶ 8(b). The written agreement further emphasizes this point in the same section stating, "[e]xcept as

specifically provided in this subparagraph (b), you shall not be entitled to any commission, fees, or other remuneration whatsoever from C&W subsequent to the termination of [Plaintiff's] engagement." *Id.*

43.    Defendant and Plaintiff have never fully executed a Pending Deals List as contemplated by paragraph 8(b) of the broker/salesperson agreement.

44.    Despite these contractual provisions, and in the absence of a fully executing Pending Deals List, Defendant continued to pay Plaintiff commissions after her termination. Defendant has breached, or otherwise waived or modified, Plaintiff's broker/salesperson agreement, particularly with respect to its provisions related to payment of Plaintiff's post-termination commissions.

45.    Indeed, Defendant has paid Plaintiff commissions totaling $71,849.94 since her termination on October 29, 2025.

46.    Further, Defendant has paid Plaintiff commissions for no less than six (6) deals that the Healthcare Advisory Practice closed after Plaintiff's termination—the total amount of commission Plaintiff received from these deals is $3,912.76.

47.    Defendant insists that it has plenary discretion to determine what commissions Plaintiff gets paid following the end of her engagement on October 29, 2025, regardless of what Sullivan previously promised her, the terms set forth in the broker/salesperson agreement, and/or the prior course of dealing of the brokers in the Healthcare Advisory Practice.

48.    Accordingly, Defendant has not paid Plaintiff commissions for the vast majority of deals promised to her by Sullivan in his October 23, 2025 email (described above) and in his earlier assurances to "pay [her] out."

49. Paragraph 3 of Plaintiff's broker/salesperson agreement with Defendant also requires to Defendant to annually "make available to [Plaintiff] a statement setting forth in reasonable detail the commissions and fees payable potentially to became payable to C&W as a result of the consummated transaction in which [Plaintiff] ha[s] participated." Ex. A ¶ 3.

50. Despite repeated demands by Plaintiff, Defendant has not produced the statement required by paragraph 3 of the broker/salesperson agreement.

## COUNT I – BREACH OF CONTRACT

51. Plaintiff adopts and incorporates by reference all the forgoing allegations as if set forth in full herein.

52. Plaintiff and Defendant had a valid and enforceable contract governing their relationship with respect to Plaintiff's work for Defendant as a real estate broker.

53. Plaintiff fully performed under this contract by, *inter alia*, providing real estate brokerage services to Defendant and/or Defendant's clients.

54. Defendant materially breached this contract by failing to pay Plaintiff her share of commissions on real estate deals closed by the Healthcare Advisory Practice after her termination, as agreed by Matthew Sullivan on multiple occasions and as was the course of dealing of the Healthcare Advisory Practice.

55. Defendant breached or otherwise modified or waived any right it might have under the written agreement for a "fully executed" Pending Deals List setting forth the post-termination commission payments to Plaintiff by making substantial payments to Plaintiff after her termination.

56. As a direct, legal, and/or proximate cause of Defendant's material breach, Plaintiff suffered damages.

## COUNT II – BREACH OF CONTRACT

57.     Plaintiff adopts and incorporates by reference all the allegations in Paragraphs 1 through 50 as if set forth in full herein. Pursuant to Maryland Rule 2-303(c), Count II is asserted in the alternative to Counts I, III, and IV.

58.     Plaintiff and Defendant had a valid and enforceable contract governing their relationship with respect to Plaintiff's work for Defendant as a real estate broker.

59.     Plaintiff fully performed under this contract by, *inter alia*, providing real estate brokerage services to Defendant and/or Defendant's clients during the term of the contract.

60.      Defendant materially breached the contract by failing to honor its agreement to pay Plaintiff her share of commissions on deals closed by the Healthcare Advisory Practice after her termination, by failing to provide her with fourteen (14) days prior written notice to her termination, and by failing to provide her with the annual statement of real estate deals she participated in that could or did produce commissions payable to Defendant in the year 2025.

61.     Defendant acted arbitrarily and in bad faith with these breaches, injuring Plaintiff's right to receive the benefit of the contract. Defendant acted as if no contract existed between the parties and it had no duties to Plaintiff, which, in addition to breaching the contract between the parties, breached the implied covenant of good faith and fair dealing.

62.     As a direct, legal, and/or proximate cause of Defendant's material breach, Plaintiff suffered damages.

## COUNT III – PROMISSORY ESTOPPEL

63.     Plaintiff adopts and incorporates by reference all the allegations in Paragraphs 1 through 50 as if set forth in full herein. Pursuant to Maryland Rule 2-303(c), Count III is asserted in the alternative to Counts I, II, and IV.

64. Defendant made a clear and definite promise to pay Plaintiff her customary commission split on all deals that the Healthcare Advisory Practice closed prior to December 31, 2025, along with ten (10) deals of her choice that closed between January 1, 2026 and March 31, 2026, including the Lafayette and Huntsville deals.

65. Defendant reasonably expected this promise would induce action by Plaintiff.

66. Defendant's promise did in fact induce Plaintiff to act: Plaintiff rationally relied on such promise when she continued to provide brokerage services to Defendant and/or Defendant's clients for weeks after Defendant informed Plaintiff she needed to resign in early October 2025.

67. Defendant wrongfully withheld payment to Plaintiff for the vast majority of the commissions promised to her, and injustice will result if Defendants' promise is not enforced.

68. As a direct, legal, and/or proximate cause of Defendant's failure to deliver what it promised, Plaintiff suffered damages.

## COUNT IV – UNJUST ENRICHMENT

69. Plaintiff adopts and incorporates by reference the allegations in Paragraphs 1 through 50 as if set forth in full herein. Pursuant to Maryland Rule 2-303(c), Count IV is asserted in the alternative to Counts I, II, and III.

70. As detailed above, Defendant made a clear, definite promise to Plaintiff to pay Plaintiff her customary commission split on all deals that the Healthcare Advisory Practice closed prior to December 31, 2025, along with 10 deals of her choice that closed between January 1, 2026 and March 31, 2026, including the Lafayette and Huntsville deals.

71. Defendants reasonably expected that its promise would induce Plaintiff to act.

72. In reasonable reliance on Defendant's promise, Plaintiff did act and conferred a benefit on Defendant: Plaintiff continued to provide brokerage services to Defendant and/or

Defendant's clients for weeks after Defendant informed Plaintiff she needed to resign in early October 2025. Defendant had knowledge of this benefit.

73.     Defendant failed to fully perform its promise: Defendant did not pay Plaintiff the vast majority of the commissions promised to her, namely the her commission splits on deals closed by the Healthcare Advisory Practice before the end of 2025, and 10 deals of her choice that closed between January 1, 2026 and March 31, 2026, including the Lafayette and Huntsville deals.

74.     Defendant retains the full benefit of Plaintiff's actions, and injustice will result if Defendants retain this benefit without full payment to Plaintiffs.

75.     As a direct, legal, and/or proximate cause of Defendant's failure to deliver what it promised, Plaintiff suffered damages.

## COUNT V – INTENTIONAL MISREPRESENTATION/FRAUD

76.     Plaintiff adopts and incorporates by reference the allegations in Paragraphs 1 through 50 as if set forth in full herein.

77.     Defendant, by and through Matthew Sullivan, made false statements to Plaintiff orally and in writing during the month of October 2025 with respect to her compensation following the end of her employment with Defendant. To wit, on or about October 23, 2025, Defendant, by and through Matthew Sullivan, told Plaintiff via email that she would be paid her customary commission split on all deals that the Healthcare Advisory Practice closed prior to December 31, 2025, along with ten (10) deals of her choice that closed between January 1, 2026 and March 31, 2026, including the Lafayette and Huntsville deals. Defendant, by and through Matthew Sullivan, also made similar oral promises about paying out Plaintiff for her work for the Healthcare Advisory Practice during the month of October 2025.

78.   These statements were false, or made with a reckless indifference to the truth, because Defendant never intended to pay Plaintiff commissions on the promised deals. Defendant, by and through Matthew Sullivan, sought either to terminate Plaintiff or transition her to a salaried role wherein she would no longer receive commissions, which, in either event, would increase the size of commissions payable to Sullivan and other brokers for deals closed by the Healthcare Advisory Practice.

79.   The false statements were made to induce Plaintiff to continue working for Defendant long enough to transition clients to other brokers in the Healthcare Advisory Practice and to not disrupt any ongoing deal negotiations. Had Defendant, by and through Matthew Sullivan, not made the false statements and instead agreed to compensate Plaintiff on the few deals ultimately offers to her, Plaintiff would not have continued working (beyond what was required by her contract) for Defendant during the month of October after Sullivan informed her, she needed to resign.

80.   In justified and reasonable reliance on Defendant's false statements, Plaintiff continued to work at Defendant for the remainder of the month of October supporting Defendant's business beyond what was required of her by her contract.

81.   As a result of Defendant's false statements, Plaintiff incurred damages.

82.   Defendant's false statements were made with actual malice as such statements were characterized by evil motive, intent to injure, ill will, and/or fraud.

WHEREFORE, Plaintiff Kirsten Ryan respectfully request this Court enter judgment against Defendant Cushman & Wakefield U.S., Inc., for compensatory damages in an amount that exceeds $75,000, punitive damages in the amount of $500,000, plus any applicable pre- and post-

judgment interest, attorneys' fees permitted by contract, and any additional costs or further relief this Court deems just and proper.

Respectfully submitted,

/s/ Jacob I. Weddle
Jacob I. Weddle, Esq. (CFP #0712120390)
Ian T. Jones, Esq. (CFP #2511201126)
Remus, Weddle & Cavenee, LLC
18 West Church Street
Frederick, Maryland 21701
301-206-5770 (office)
301-206-5771 (fax)
jweddle@rwclawyers.com
ijones@rwclawyers.com
Counsel for Plaintiff